IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**BENTLEY COOKS,**   CASE NO. 3:21 CV 1368

    Plaintiff,

    v.   JUDGE JAMES R. KNEPP II

**FORD MOTOR COMPANY,**

    Defendant.   **MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

This case arises out of Plaintiff Bentley Cooks's claim that his former employer, Defendant Ford Motor Company, committed race discrimination and retaliation against him in violation of Ohio Revised Code § 4112.02. The matter now before the Court is Defendant's Motion for Summary Judgment (Doc. 17). Plaintiff opposed (Doc. 18), and Defendant replied (Doc. 19). Jurisdiction is proper under 28 U.S.C. § 1332.

For the reasons set forth below, Defendant's motion (Doc. 17) is granted.

### BACKGROUND

Viewing the facts in the light most favorable to Plaintiff, the background of this case is as follows:

Plaintiff, who is African-American, worked for Defendant from April 2016 until July 2019 at its engine plant located in Lima, Ohio. (Plaintiff Depo., at 45-47)[1]. Plaintiff was initially hired

---

1. Citations to the transcript of Plaintiff's deposition, which is located at ECF Docs. 17-2 and 17-3, refer to the page number of the deposition, rather than the ECF page number.

on as a temporary part-time employee before gaining full-time employment in May 2017. *Id*. Defendant is a global automotive manufacturer and distributor.

Plaintiff was a member of the United Auto Workers Union. *Id.* at 38. He worked as an engine technician on a line assembling engines. (Doc. 17-2, at 56-57). Plaintiff worked the afternoon shift on Team 3. (Plaintiff Depo., at 129). He worked under process coaches Chris Miller ("C. Miller") and Tracy Veira. *Id.* at 132-33. Plaintiff's team leader was Anthony Miller ("A. Miller"). *Id.* at 91. Plaintiff's shift had a start time which varied between 2:30 and 3:30 p.m. and ended at either 11:00 p.m. or 1:00 a.m. with a 35-minute lunch break and two 20-minute breaks. *Id.* at 137-38. Team 3 consisted of twelve employees. (Doc. 17-5, at 9-10).

On the line, engines move through assembly stations where technicians add parts at each stop. *Id.* at 15. Engines are at a station for about 30 seconds before moving to the next. *Id.*

Workplace Policies

The standard procedure for an on-line employee to leave the line is to notify team members he needs relief. (Doc. 17-6, at 18-19). If the team leader or repair bay employee are available, one will cover the employee's station on the line until the employee returns. *Id.* at 21. The team leader does not have authority to permit an employee to leave the line if the station is not covered. *Id.*; *see also* Plaintiff Depo., at 241. If the team leader or repair bay employee cannot cover the station, the employee must receive permission from the process coach to leave it unattended. (Doc. 17-6, at 19).

History of Discipline and Complaints of Unfair Treatment

Plaintiff was a full-time employee for more than two years. He was disciplined at least eight times during his employment. Plaintiff also made complaints regarding unfair treatment.

2

Plaintiff received his first reprimand on May 30, 2018, for leaving the plant on May 25, 2018, without permission. (Plaintiff Depo., at 175). Plaintiff asked to leave the plant for a family emergency after his daughter called and said she was in a physical altercation. *Id.* at 174. Plaintiff's process coach told him he could not leave and to return to work. *Id.* at 174-75. Plaintiff told his process coach he was going to the union office but instead he left the plant to get his daughter. *Id.* at 175-76. He did not tell his supervisor he left or that he would not return. *Id.* at 181.

Plaintiff was reprimanded on July 19, 2018, after he left the line to use the restroom without permission; he was suspended for one week. *Id.* at 193-99.

On August 3, 2018, Plaintiff received a reprimand after he was late to work multiple times. *Id.* at 193; Doc. 17-3, at 116.

On September 5, 2018, Plaintiff was reprimanded after calling a female employee "hoelike" in response to how the "Go Home" list was offered to employees. Plaintiff Depo., at 197-99; Doc. 17-3, at 118-19. The "Go Home" list signified the order in which employees would be allowed to leave if more employees were at the plant than necessary. (Plaintiff Depo., at 197). Defendant found Plaintiff's comments violated the "Zero Tolerance Anti-Harassment Policy". (Doc. 17-3, at 119). He was suspended for one week. *Id.*

Plaintiff made his first workplace complaint on September 21, 2018. *Id.* at 120. He called Defendant's harassment hotline and complained of unfair treatment. *Id.* On the call, Plaintiff stated he had been subject to unfair scrutiny following his May 30, 2018, discipline. Plaintiff complained that "being birdwatched" was unfair because he served his punishment and said his past issues should not be held against him. *Id.* He also said other employees were treated better. *Id.*

Defendant reprimanded Plaintiff and suspended him for a week on October 16, 2018, for a disrespectful conversation with management. *Id.* at 124. Plaintiff recalled "[a manager] was giving me attitude. I was giving her a little attitude back." (Plaintiff Depo., at 218).

In November 2018, Plaintiff's timesheet was docked 15 minutes for leaving work early on November 8, 2018. (Doc. 17-6, at 53). Plaintiff told his process coach, C. Miller, that he did not leave early on November 8, 2018, and called C. Miller racist. *Id.* Coworkers submitted written statements in support of Plaintiff which stated he did not leave early. *Id.* at 55-57.

Plaintiff was reprimanded and suspended for leaving the line without permission on November 15, 2018. (Doc. 17-3, at 125-27). The Disciplinary Action Report states Plaintiff left the work area without permission and was gone for 21 minutes. *Id.* Plaintiff testified he went to the restroom but that he was not gone for 21 minutes. (Plaintiff Depo., at 221-24).

Plaintiff was reprimanded and suspended for a month after going to the restroom for fifteen minutes on February 7, 2019. *Id.* at 225-27. Plaintiff testified management told him to "just let somebody know" if he used the restroom, and he told coworker Lyman Tate before he left the line. *Id.* at 227. The Disciplinary Action Report indicates Plaintiff left the line without permission. (Doc. 17-3, at 129).

In April 2019 Plaintiff was suspended for one month after leaving the line to use the restroom. (Plaintiff Depo., at 228-30). Plaintiff notified coworker Lyman Tate before going to the restroom. *Id.* Still frames of surveillance footage from April 15, 2019, show Plaintiff in a hallway holding a white plastic bag. *Id.* at 229-30; Doc. 17-3, at 131-38. Photographs show a white plastic bag and food on the wall and ground of the same hallway. (Doc. 17-3, at 131-38). Plaintiff was later accused of throwing food in the hallway, but he denied the accusations to the Union President. (Plaintiff Depo., at 230).

Termination of Employment

On July 18, 2019, the afternoon shift team was two employees short. (Doc. 17-5, at 14). Plaintiff was assigned to work on heads and gaskets. (Plaintiff Depo., at 232). Because the team was short staffed, Plaintiff's team leader, A. Miller, had to fill a spot on the line, and the team operated without a repair bay employee. (Doc. 17-5, at 15).

Plaintiff's break ended at 11:50 p.m., and soon after the break ended, Plaintiff told A. Miller he lost his ear buds; A. Miller pointed to the trash can to indicate Plaintiff may have accidentally thrown the headphones away during the break. (Plaintiff Depo., at 252). After he returned, Plaintiff next told A. Miller he was going to use the restroom. *Id.* at 235. A. Miller acknowledged Plaintiff and nodded his head but did not verbally respond. *Id*. Plaintiff then left the line for a third time to get water. *Id.* at 236. Again, Plaintiff told A. Miller who nodded but did not verbally respond. *Id*.

At 12:40 a.m., process coach Tracy Veira noticed a gap in production. *Id.* at 37. Veira observed Plaintiff was not at his station. *Id.* Plaintiff worked on six engines between when his break ended at 11:50 p.m. and when his shift ended at 1:00 a.m. (Doc. 17-6, at 39). Veira told Plaintiff he was on notice for a discipline hearing for being off the line without permission. *Id.* at 38.

On July 22, 2019, Plaintiff attended a meeting with union representative Tim Rist, labor relations representative Jennifer Rigdon, and human resources business advisor Ray Kreiger. (Plaintiff Depo., at 249). Rigdon told Plaintiff his employment was terminated. *Id.* at 250. Security began to escort Plaintiff off the premise. *Id.* at 251. Plaintiff had a physical altercation with security; security pushed Plaintiff; Plaintiff pulled away from security and then punched C. Miller on the plant floor. *Id.* at 253-54. Plaintiff fractured his thumb and required surgery as a result of the punch. *Id.* at 109. He went to jail for ten days. *Id.* at 20.

5

On July 28, 2020, Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission based on race discrimination and retaliation. (Doc. 17-10). The Commission dismissed the claim (Doc. 1-3), and Plaintiff filed the instant action on July 16, 2021 (Doc. 1).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Plaintiff alleges Defendant discriminated against him based on race in violation of Ohio Revised Code § 4112.01 *et seq.* He further alleges Defendant unlawfully retaliated against him for

engaging in protected activities in violation of Ohio Revised Code § 4112.02(I). For the reasons discussed below, the Court finds Defendant is entitled to summary judgment.

Discrimination

In Count One, Plaintiff brings a claim of discrimination under Ohio Revised Code § 4112.01 *et seq.*

"Ohio courts hold that federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to state-law discrimination claims under R.C. Chapter 4112." *Martin v. Block Commc'ns, Inc.*, 2017-Ohio-1474, ¶ 25 (Ohio Ct. App.). "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)).

Title VII expressly prohibits employers from treating employees differently according to their race. *See* 42 U.S.C. § 2000e-2(a)(1). When a plaintiff does not put forth direct evidence of racial discrimination, this Court applies the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). This framework places the initial burden on Plaintiff to establish his prima facie case. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). To satisfy this burden, the plaintiff must show "(1) [he] was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006) (internal citations and quotations omitted); *see Johnson v.*

7

*Toledo Bd. of Educ. of Toledo City Sch. Dist. & Toledo Fed'n of Teachers*, 2023-Ohio-1306, ¶ 22 (Ohio Ct. App.) (applying the *McDonnell Douglas* framework) (citing *Williams v. Akron*, 837 N.E.2d 1169 (Ohio 2005)). If the plaintiff can establish a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant articulates such a reason, the burden shifts back to the plaintiff to demonstrate the proffered reason was a mere pretext for discrimination. *Id*. at 253.

Because the parties agree there is no direct evidence of discrimination, this case must be analyzed under the burden-shifting analysis. *See* Doc. 17, at 11; Doc. 18, at 12.

*Prima Facie Case*

Defendant contends it is entitled to summary judgment because Plaintiff has no evidence to create a genuine issue of material fact regarding the similarly situated prong of his prima facie case. (Doc. 17, at 11-13). Plaintiff rebuts that there is evidence to overcome summary judgment and references his deposition testimony identifying Caucasian employees who were not disciplined for using the restroom or leaving for family emergencies. (Doc. 18, at 13).

To satisfy the similarly-situated prong, the Sixth Circuit historically required plaintiffs to point to "comparable[ ]" employees who are "similarly-situated in all respects", meaning individuals who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The Sixth Circuit has since clarified that "[a] court's formulation of the similarly-situated inquiry should not be exceedingly narrow", and individuals are considered similarly situated "if they are similar (though not identical) in all relevant respects."

8

*Lynch v. ITT Educ. Servs., Inc.,* 571 F. App'x 440, 444 (6th Cir. 2014) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)). Thus, "the appropriate test is to look at [the *Mitchell*] factors relevant to the factual context, as opposed to a requirement that a plaintiff demonstrate similarity in all respects." *Jackson v. FedEx Corp. Servs.*, 518 F.3d 388, 396 (6th Cir. 1998) (internal citations omitted).

Plaintiff attempts to satisfy this prong through reliance on his deposition testimony wherein he identified Caucasian employees who were not disciplined for engaging in similar behavior. (Doc. 18, at 13). Specifically, Plaintiff relies on the following testimony:

> Q. You allege, in paragraph 33, that "Ford allowed Caucasian employees time off work for emergencies without discipline." Do you see where I am?
>
> A. Yes, sir.
>
> Q. Could you give me the name and circumstances of every Caucasian employee you're aware of that supports that allegation?
>
> A. My line leader, Andrew, had a family emergency. He had to leave. The specific date and time, I can't recall.
>
> Q. What was the nature of the emergency?
>
> A. I don't know. You -- you don't – they don't -- you don't ask somebody what was their emergency because it's a family emergency.
>
> Q. Okay. You just know that he left.
>
> A. He said he had a family emergency and he had to take off.
>
> Q. Okay. Who else?
>
> A. The Ashley -- the Ashley girl. Lee Ann.
>
> Q. With Ashley, do you remember when or the details?
>
> A. All of these people, I'm sorry, I'm going to give you, I don't -- I didn't have specifics about what happened. I just know they had a family emergency and then they got to leave –

9

Q. Okay.

A. -- without no fault.

Q. Who else?

A. What's the last name you have?

Q. Ashley. Andrew and Ashley.

A. Lee Ann. Shirley. At this time, that's all I can recall at this time.

Q. You're not aware of any African American employees that had a family emergency and were allowed to leave?

A. No, I can't recall at this time.

Q. Anyone else?

A. Not at this time.

Q. In paragraph 34, you allege that "Ford allowed Caucasian employees to leave work due to emergencies with only a written warning." Do you see where I am?

A. Yes, sir.

Q. Which Caucasian employees are you referring to there?

A. Specifically, I can't recall a specific employee right now, sir.

Q. Anything that would refresh your memory?

A. At this time, no.

Q. As an hourly employee at Ford, were you aware of the progressive discipline of other employees?

A. More specifically what do you mean?

Q. Sure. Were you aware of the progressive discipline that your coworkers received?

A. When they would relay it, when they would tell you, you would find out, but, other than that, that's the only way you would know if somebody – if somebody that was disciplined told you.

> Q. And did any employees tell you that they had received a written warning – a written warning for the first time they left work without authorization?
>
> A. I can't recall at this time.
>
> * * *
>
> Q. Okay. If you could grab Exhibits [sic] 15 and I'll ask you the same question about each, starting with 15. Are you aware of any Caucasian employees that were treated more favorably than you under identical circumstances with regard to the week suspension you received as reflected in Exhibit 15?
>
> A. Well, this was me going to the restroom. It was a lot of employees, Caucasian employees, that went to the restroom and didn't have any type of discipline behind it.
>
> * * *
>
> Q. Okay. Do you remember specifically any Caucasian employees that were treated more favorably than you with regard to a similar situation?
>
> A. Yes. The list I gave you before, they would -- they would -- everybody -- they would all be able to use the restroom and go freely as much as they wanted to. There was a girl, Ashley, she took a break, a 10-minute break every hour, and I brought that to their attention and they'd just shoot me under the rug like it was nothing.
>
> Q. Okay. Any others? Can you be any more specific about any others?
>
> A. Alexis, Lee Ann.
>
> Q. Any specifics you can remember about any of them?
>
> A. A specific incident, no, I can't, other than the names.

(Plaintiff Depo., at 188-90, 199-200).

Plaintiff's reliance on the mentioned "similarly situated" employees is insufficient to satisfy his prima facie burden. Plaintiff's disciplinary history entailed discipline for the following: Plaintiff (1) left the line for the restroom without permission and/or coverage on multiple occasions; (2) left the plant for a family emergency after he was denied permission and did not

11

inform a supervisor; (3) called a female coworker "hoelike"; (4) arrived late to his shift; (5) engaged in disrespectful conversation with management; (6) accused of leaving the plant before his shift ended; and lastly, Plaintiff was ultimately fired for the events of July 18, 2019, where he (7) left the line on three separate occasions, wherein each time he informed his team leader but did not ensure he obtained coverage, and worked on six engines between when his break ended at 11:50 p.m. and when his shift ended at 1:00 a.m.

*Disciplinary History*

"To make out a case of disparate treatment, the plaintiff must produce specific facts showing he and the non-minority employee engaged in similar conduct." *Wingo v. Mich. Bell Tel. Co.*, 2019 U.S. Dist. LEXIS 25, at *26 (E.D. Mich). And, "[w]here an employer uses a system of progressive discipline, the disciplinary history of a plaintiff is critical to evaluating disparate treatment." *Id.* In *Berry v. City of Pontiac*, the Sixth Circuit held a plaintiff could not show two comparators were similarly situated where their progressive discipline history was not as extensive as the plaintiff's. 269 F. App'x 545, 549 (6th Cir. 2008). Here, Plaintiff has not provided any evidence regarding the disciplinary history of the proposed comparators, and thus, has failed to show any were similarly situated as it relates to his termination. *Seig v. Mercy Franciscan at Schroeder*, 2015 U.S. Dist. LEXIS 29193, at *12 (S.D. Ohio) ("Given the discrepancies in the disciplinary histories, the Court cannot conclude that [p]laintiff and Bellisari were similarly situated."); *Bonfiglio v. Toledo Hosp.*, 2018 U.S. Dist. LEXIS 187204, at *18 (N.D. Ohio) ("Bonfiglio fails . . . to introduce evidence that those employees had any record of behavioral or disciplinary issues, much less that any such record was as substantial as his own. Bonfiglio has failed, then, to demonstrate that these women are similarly situated to him.").

12

Moreover, Plaintiff has failed to introduce any admissible evidence to support his argument that the proposed comparators were disciplined less severely or not disciplined at all. Plaintiff testified he only learned of his coworkers' disciplinary history "[w]hen they would relay it, when they would tell you, you would find out, but, other than that, that's the only way you would know if somebody – if somebody that was disciplined told you." (Plaintiff Depo., at 190). Under the Rules of Evidence, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602; *Cf.* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge"). Plaintiff testified he was unable to recall whether any proposed comparators told him they received only "a written warning for the first time they left work without authorization." (Plaintiff Depo., at 190). Plaintiff at best has established secondhand knowledge of some of the proposed comparators' disciplinary histories. Accordingly, Plaintiff is unable to establish his prima facie case because he did not identify admissible evidence which shows the proposed comparators were disciplined less severely or were not disciplined at all.

*Family Emergencies*

Assuming for the sake of argument that Plaintiff introduced admissible evidence concerning the disciplinary history of the proposed comparators, Plaintiff is still unable to carry his prima facie burden. Plaintiff first argues the similarly-situated prong of his prima facie case is satisfied because other employees were not disciplined after leaving for family emergencies. (Doc. 18, at 13). However, Plaintiff's identification of purportedly Caucasian coworkers who were allowed to leave for a family emergency fails to show they "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. "For [] [P]laintiff to meet [his]

13

burden, [he] must do more than make 'generalized and vague allegations' that another employee was treated better than [him]." *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (quoting *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 147 (6th Cir. 2007)). Plaintiff does not know the circumstances of the identified employees' family emergencies. (Plaintiff Depo., at 188-90). He does not identify which supervisor(s) permitted the other employees to leave. *Id.* He does not provide evidence pertaining to other "mitigating circumstances" such as the availability of other staff to cover the stations of the other employees at the time of their respective family emergencies. *Id.* Plaintiff does not provide any evidence showing the "similarly-situated" employees left work after they were denied permission to leave. *Id.*

    *Restroom Usage*

  Plaintiff also failed to provide evidence showing he was treated less favorably than non-protected employees regarding restroom use. Plaintiff testified that coworker "Ashley, she took . . . a 10-minute break every hour" and that "everybody -- they would all be able to use the restroom and go freely as much as they wanted to." (Plaintiff Depo., at 200). Plaintiff was unable to remember specific instances where the other named employees were treated differently, testifying "[a] specific incident, no, I can't, other than the names." *Id.* Neither the identification of Ashley nor the other employees provide more than "generalized and vague allegations that another employee was treated better than [him]." *Stewart*, 815 F. App'x at 17 (internal quotation omitted). Plaintiff offers no evidence concerning the circumstances of Ashley's requests to leave the line, whether she had coverage at her station each time she left, or other information sufficient for the Court to discern whether there exist "differentiating or mitigating circumstances that would distinguish" Ashley's conduct from Plaintiff's. *Mitchell*, 964 F.2d at 583. The Court finds

Plaintiff's mere identification of other employees is too generalized and vague to satisfy his prima facie case.

Plaintiff has not identified comparable non-protected employees that were similarly situated in all relevant respects who were treated more favorably. Plaintiff has not satisfied his prima facie burden, and Defendant is entitled to summary judgment on the claim of discrimination.

Retaliation

In Count Two, Plaintiff alleges retaliation in violation of Ohio Revised Code § 4112.02(I). (Doc. 1, at ¶¶ 102-10). "To establish a retaliation claim, the plaintiff must show that (1) [he] engaged in a protected activity, (2) [he] was subjected to an adverse employment action, and (3) there was a causal link between the protected activity and the adverse action. In presenting a prima facie case of retaliation, the plaintiff is not required to conclusively prove all the elements of his claim, however, the plaintiff must ultimately prove, by a preponderance of the evidence, that the plaintiff's protected activity was the determinative factor in the employer's adverse employment action." *Taylor-Stephens v. Rite Aid of Ohio*, 2018-Ohio-4714, ¶ 54 (Ohio Ct. App.). "Ohio courts have held that federal law provides the applicable analysis for reviewing retaliation claims brought under Ohio Rev. Code § 4112.02(I)." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (citing *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)) (cleaned up).

Defendant argues Plaintiff is unable to establish a prima facie case of discrimination because (1) he did not engage in a protected activity and, (2) alternatively, there is no causal link between a protected activity and adverse action. (Doc. 17, at 16-18). Plaintiff argues in opposition that he engaged in two protected activities: (1) calling Defendant's ethics hotline wherein he complained of unfair treatment; and (2) calling C. Miller a racist for "believ[ing] all black people

looked the same" after C. Miller, according to Plaintiff, confused him with another African-American employee. (Doc. 17-6, at 29-31). Plaintiff also argues he can establish the causal connection prong through a combination of temporal proximity and unfavorable treatment compared to other employees. (Doc. 18, at 17-19).

*Protected Activity*

"Title VII forbids employers from retaliating against employees who oppose employment practices that may be unlawful under Title VII. An employee does not need to be correct that the employment practices he opposes are actually unlawful. Instead, the employee need only prove that his complaints about the employment practices were based on a reasonable and good faith belief that the opposed practices were unlawful. The requirement that the complaint be based on a reasonable and good faith belief has both an objective and subjective component. The employee who complains must actually believe that the conduct complained of constituted a violation of relevant law, and a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee would believe that the conduct complained of was unlawful." *Caldwell v. Gasper*, 2022 U.S. App. LEXIS 30418, at *18-19 (6th Cir.) (internal citations omitted); *see also Amesse v. Wright State Physicians, Inc.*, 2018-Ohio-416, ¶ 39 (Ohio Ct. App.) ("protection attaches if the manner of opposition is reasonable and is based on a reasonable and good faith belief that the challenged conduct is unlawful").

"A vague charge of discrimination does not constitute protected activity." *Caldwell*, 2022 U.S. App. LEXIS 30418, at *19 (citing *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). "A plaintiff need not lodge a complaint with absolute formality, clarity, or precision but must make a specific allegation about unlawful employment discrimination and not merely express concern about management practices." *Id.*; *see also Brown v. O'Reilly*

16

*Auto. Stores, Inc.*, 2015-Ohio-5146, ¶ 32 (Ohio Ct. App.) ("Vague charges of discrimination do not invoke the protection of the law.").

Plaintiff argues the September 21, 2018, phone call to Defendant's ethics hotline constituted a protected activity because Plaintiff said on the call he was treated different than other employees. (Doc. 17-3, at 120); (Doc. 18, at 17-18). During his deposition, Plaintiff confirmed a summary of the call attached as an exhibit accurately represented the contents of his hotline complaint. (Doc. 19, at 209). The summary states Plaintiff felt unfairly "birdwatched" after he was disciplined for leaving work without permission for a family emergency, and that others were not scrutinized for similar conduct. (Doc. 17-3, at 120). Plaintiff stated he felt he had served his punishment and should not still be viewed in a negative light. *Id.* Plaintiff also believed he was watched closer as the result of a personal gripe. *Id.* Nothing in Plaintiff's deposition or the attached exhibit suggests Plaintiff ever mentioned racial discrimination. Therefore, the call is at most a "vague charge of discrimination" and is not a protected activity for purposes of Plaintiff's retaliation claim. *Caldwell*, 2022 U.S. App. LEXIS 30418, at *19.

Plaintiff argues his comments to C. Miller are a protected activity. Plaintiff called C. Miller a racist after C. Miller docked Plaintiff's pay for leaving his shift early. (Doc. 17-6, at 30). Plaintiff denied he left the shift early and accused C. Miller of racism for "believ[ing] all black people look the same." *Id.* In *Childers v. GM LLC*, the Eastern District of Michigan held an isolated complaint to a manager about a racist remark was "an insufficient basis for [the p]laintiff's retaliation claims." 2019 U.S. Dist. LEXIS 24100, at *20 (E.D. Mich). In *Warren v. Hollingsworth Mgmt. Servs., LLC*, the Eastern District of Michigan held that a complaint of sexist insubordination from an employee was not a protected activity because it did not contemplate an employer practice. 2022 U.S. Dist. LEXIS 3257, at *50 (E.D. Mich.). Here, Plaintiff's remark to C. Miller is at most

17

a vague charge of discrimination. He did not complain that Defendant was engaged in racially discriminatory employment practices, but instead merely opined his supervisor mistook him for another employee as a result of racial bias. In the light most favorable to Plaintiff, this isolated incident is insufficient to constitute a protected activity under Ohio's anti-retaliation provision.

Because Plaintiff did not show he engaged in a protected activity, he has not met his prima facie burden, and Defendant is entitled to judgment in its favor on the claim of retaliation.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 17) be, and the same hereby is, GRANTED.

 s/ *James R. Knepp II*  
UNITED STATES DISTRICT JUDGE